Argued October 18; reversed December 3, 1929

# CLARA BURKE SEATON *v.* SECURITY SAVINGS & TRUST CO.

(282 Pac. 556)

For appellant there was a brief over the name of *Mr. O. C. Roehr* with an oral argument by *Mr. V. V. Pendergrass.*

For respondent there was a brief over the name of *Mr. Allan R. Joy* with oral arguments by *Mr. Thomas Mannix* and *Mr. A. Hansen.*

ROSSMAN, J.   The complaint avers two causes of action in favor of the plaintiff against the estate of Willard H. Seaton upon an alleged express oral agreement for the payment of money; the first cause of action recites that in the period of time extending from December, 1910, to December 13, 1926, which was the date of the death of the deceased, the plaintiff performed services for him as housekeeper of the value of $4,680; she was paid on account $345, and demands judgment for the balance of $4,335; the second cause of action alleges that the plaintiff deposited with the deceased from time to time sums of money under an agreement for their investment; that at the time of the death these deposits had totaled $13,300; that only $1,900 had been returned to her and she therefore sought judgment for the balance, $11,400. Since no question of pleading is presented, we shall proceed at once to a statement, brief in nature, of the evidence; a review of the latter seems desirable, on account of the nature of the question presented for our disposition which arises out of the circumstances that after the jury had returned a verdict for the defendant the circuit court set it aside and ordered a new trial. This

order was predicated upon a recital that the court had erred in its instruction to the jury and that since the trial the plaintiff had discovered new evidence material to her causes of action.

The plaintiff's evidence was to the effect that she and Seaton met each other in 1909 in Seattle; at that time she was "making waffles as a cook," and the defendant had no employment but "had plenty of good clothes and he had plenty to eat." She testified that November 12, 1909, she commenced to work for him as a housekeeper and remained in that capacity until October 16, 1910, when he "and I got married." No documentary evidence was produced in support of this statement, and no witness present at the ceremony testified. In December of 1910, according to her account, "he received an official letter from San Francisco, California, containing papers that his wife in California was suing him for divorce. That was the first that I knew he ever had a wife there." She testified that upon receipt of this letter he confessed that he had a wife and daughter living in California, and that thereupon the two effected the agreements which constitute the foundation of her claims, which were as follows: (1) it was agreed that the plaintiff should become the defendant's housekeeper at a monthly wage of $25, plus room and board; (2) both would go to work and would "pool our money, together, and put it out on interest, and when the interest got so that we would derive $125 (per month) from it, we would both retire and in case it didn't materialize before that time, why, he would see that I got everything when he died"; the deceased, she testified, was agreed upon as the trustee of the fund. A third stipulation of the agreement contemplated "as soon as he

was free and things were straightened out and his folks wouldn't object to it then we would be married again.''

At that time the plaintiff was the mother of three children whose ages were six, eight and 10 years. According to her testimony Seaton was not then employed and she knew nothing of his financial condition, but added ''when I first met him he drank quite a bit; drank excessively at times * * * periodical drinker; he used to drink for three or four weeks, maybe a month at a time and then stop for three or four weeks.'' These habits continued until 1914, when one of his sisters sent him to San Francisco, where he was provided with a liquor cure. Thus, if her testimony is true, she entered into this contract with Seaton shortly after she discovered that he had deceived her into an illegal marriage, and at a time when she knew nothing of his financial worth, but was aware that he was a periodical drunkard and out of employment. The plaintiff testified that on the discovery of the truth of Seaton's matrimonial status she no longer lived with him ''as his wife,'' although she continued to hold herself out as ''Mrs. Seaton.'' Both she and her daughter testified that the latter believed that Seaton and the mother were husband and wife, and that she did not discover the contrary until the mother filed this complaint. The plaintiff's testimony recited that from December, 1910, to Seaton's death, December 13, 1926, she faithfully discharged her duties as his housekeeper and was paid on account only $345; that during all of that period she remained steadily employed, for the most part as waitress in restaurants and occasionally as chambermaid in hotels, and that she regularly deposited with Seaton her wages. According to her testimony Seaton

was physically able to work but was employed for only two weeks during the period of 1909 to 1915. After 1915 he was more frequently employed but apparently his total employment in the 16 years covered by the agreement amounted to only five years. She stated that during these 16 years he received an income of $33 a month from "some bonds in the East." Two or three times a week she handed him her wages and at those times they had an accounting, the precise nature of which is not revealed by the evidence; whenever he purchased a bond he reported that fact to her. She testified that at his death the investments had not yet amounted to sufficient to yield an income of $125 per month. December 12, 1926, Seaton apparently became very ill and according to the testimony his physicians ordered him removed to a hospital, but before going he expressed a desire to prepare a will and sent for a Mr. Dempsey, an attorney. When the latter could not be found Seaton said to the plaintiff's daughter, according to the mother, "you know, your mother is to get all my money and I must make my will." An hour or so later he died, before an attorney was obtained. The assets of the estate are less than the plaintiff's claim. The claimant concedes that when this alleged agreement was effected only she and Seaton were present. She contends, however, that the following testimony supports and corroborates her claim: (1) Thirty-eight checks in which she appears as the payee; these she contends were given to her for wages and were delivered by her to Seaton pursuant to the above agreement; his name, however, is endorsed upon only an occasional one of these, and the importance of this item is lessened by the fact that at that time the deceased was a clerk at the hotel where she

was employed and attended to making its bank deposits; she conceded that these checks were "the only record I have" in support of her claim; (2) testimony that Seaton held her out as his wife; (3) testimony that the plaintiff was regularly employed; (4) testimony of the plaintiff's daughter that (a) she understood the two were husband and wife, (b) that she saw her mother frequently give her wages to Seaton; (c) her testimony in harmony with the mother's concerning the events that transpired immediately prior to Seaton's death, in which he sent for an attorney to prepare his will; the daughter added: "Daddy said that he would have to fix things up because he had money that belonged to mother and she would have to have it, if anything happened to him. * * * He said he was going to leave everything to mother; that is what he always said to me." (5) The testimony of the husband of the last witness, who narrated the incidents that occurred on the night of December 12 in language substantially similar to that of the plaintiff and her daughter; he added that Seaton had frequently said that his estate constituted "all that they had accumulated in their lifetime, their married life" and referred to it as "our money."

The defendant submitted testimony which conceded that the plaintiff was the common-law wife of the deceased, but disputed the alleged agreement which constitutes the foundation of her claim. It also submitted evidence, which is uncontradicted, to the effect that between a time shortly prior to the occasion, when the plaintiff and the deceased first met, and the time of his death, Seaton received as inheritance approximately $54,000; his estate at the time of his death amounted to about $15,000.

The foregoing will suffice for a review of the evidence. We come now to a consideration of the alleged error.

The instruction complained of was too lengthy to render it practical to set it forth herein; it is assailed in three particulars, (1) because it informed the jury, so the plaintiff contends, that § 1241, O. L., requires proof of the agreement by competent or satisfactory evidence, but failed to define these qualifying words; (2) because, to adopt the plaintiff's contention, the court did not make clear to the jury that any direct or circumstantial evidence satisfactory to the jury would support a verdict for the plaintiff; and (3) because it informed the jury that there must be evidence, independent of the testimony of the plaintiff, to sustain the verdict.

Section 1241, O. L., provides:

"When the claim is presented to the executor or administrator * * * if he shall be satisfied that the claim thus presented is just * * *; but if he shall not be so satisfied, * * * provided, that no claim which shall have been rejected by the executor or administrator, as aforesaid, shall be allowed by any court, referee, or jury, except on some competent or satisfactory evidence other than the testimony of the claimant. * * *"

■■ The first two objections are clearly without merit. It is true that the instruction, in referring to the statute, several times employed the words "competent or satisfactory evidence," and such words to the lawyer, when used disjunctively, are contradictory: *Goltra v. Penland*, 45 Or. 254 (77 P. 129). But we doubt whether they present any difficulties to the layman, unfamiliar with their legal meaning, when he encounters them in the course of an oral instruction. To him, we believe, they convey the idea that the proof

must be admissible and creditable.; that is, it must not be discredited by any other proof introduced by the plaintiff. Incidentally, it may be observed, that when our previous adjudications upon this section of our code speak of it as requiring a claimant to make out a *prima facie* case by proof apart from his personal testimony they necessarily imply that it shall possess the qualities which we have just defined. Generally, instructions need not define ordinary words and phrases used in their usual and conventional sense: Randall's Instructions to Juries, § 357 to § 365, and 14 R. C. L., Instructions, § 31. A rule to the contrary might carry a set of instructions to an interminable length. An inspection of the citations just noted will show that such terms as "negligence," "assumed risk," "circumstantial evidence," "corroboration," "contributory negligence" and the like, have been held sufficiently clear of meaning to the juror's mind that it is not error to refrain from defining them. But it is not necessary to resort to a similar conclusion in regard to the words now before us, because the instructions pointed out to the jury clearly upon what type of proof it would act; thus the instruction stated:

"* * * Without proof of that agreement by testimony other than her own, she has no cause, and you must find that no such agreement existed. But, this does not mean that the claimant—that would be the plaintiff in this case—is not a competent witness in her own behalf. Her testimony must be considered as any other testimony in the case, but with this limitation that it alone is not sufficient to establish the claim. Such corroboration may be shown by circumstances and by the proof of any fact or facts which are sufficient to satisfy your minds that the agreement claimed to have been made by plaintiff was made and performed."

It closed with these words:

"In other words, you could not, just because you might be convinced that she had performed some services, you could not merely from that give her a verdict, but you must be satisfied that there was a contract relative to these services, and that she performed her part of the contract and that she is entitled to what she claims, or some part of what she claims. Those are the matters which in the final analysis are for you to determine from all the evidence in this case."

■ Previously the court had instructed the jury that in civil cases, such as this, a plaintiff must establish her claim by a preponderance of the evidence, and that this rule demanded that she must make "the better case." We are of the opinion that the two objections just mentioned are without merit. The third objection we likewise believe is unavailable. First, we seriously doubt whether the plaintiff produced any testimony, independent of her own that in 1910 she and Seaton entered into the contract mentioned in the complaint. It is true that she supplied testimony from her daughter's lips that at times she handed to the deceased sums of money, that he admitted that all that "we" have constitutes "our" savings, that he had money which belonged to the plaintiff, and that he contemplated making her the sole beneficiary of his will: yet, we can not understand how this evidence is possessed of any more capacity to establish the alleged contract of 1910 than the circumstances, relied upon by the plaintiff in *Harding v. Grim,* 25 Or. 506 (35 P. 634), established the obligation therein sued upon. But, since the defendant has not presented this objection we shall proceed with a consideration of the third objection to the instruction. Even if we accept as proper the plaintiff's above interpretation of this

instruction (as manifested by the words of his objection), which we believe places it in its most unfavorable light, we believe that the instruction is free from error. It exacts of the claimant no more non-personal evidence than the statute as previously construed by this court.

■ In the early case of *Harding v. Grim*, supra, Mr. Justice ROBERT S. BEAN for the first time stated in the words of this court the requirements of the statute; we quote:

"* * * The effect of this statute is that, while the claimant is a competent witness in an action against an executor or administrator upon a claim or demand against the estate of the deceased he can not prevail in the action unless he proves his case by some competent or satisfactory evidence other than the testimony of himself. His testimony may be used, perhaps to corroborate other evidence in the case, but it is not sufficient, in itself, to establish his claim. There must be evidence tending to support the action, independent of his testimony, sufficient to go to the jury, and upon which the jury or other trier of fact would be authorized to find in his favor. As a consequence, it was incumbent on the plaintiff in this case to furnish some competent evidence tending to support his claim, other than his own testimony, and unless he did so, the nonsuit was properly granted."

In our most recent construction of the statute, *Fields v. Rodgers*, 128 Or. 661 (275 P. 598), written by Mr. Justice HENRY J. BEAN, *who followed* Mr. Justice ROBERT S. BEAN, we expressed ourselves as follows:

"A claimant in an action against an administrator, upon a claim or demand against the estate of the deceased, can not prevail unless he proves his case by some competent or satisfactory evidence other than the testimony of himself. His testimony may be used in addition to the other corroborative evidence, if such other evidence is of sufficient strength to support a

verdict or decree. Or otherwise expressed, having laid a foundation for a recovery by producing evidence upon the strength of which a court may render a decree, or a jury a verdict, in favor of claimant, the claimant may then buttress and re-enforce his case by his own evidence so as to produce a preponderance of evidence: *Uhler v. Harbaugh, Admr.,* 110 Or. 609, 616 (224 P. 89).''

The nature of the non-personal testimony is well defined in *Goltra v. Penland,* supra. The portion of the instruction which we have previously quoted made the most rigorous demand upon the plaintiff of any part of it; yet when that part is compared with the quotation from *Harding v. Grim,* supra, it will be observed that the circuit judge evidently modeled his instruction largely upon that decision. Other interpretations of the statute which we deem it unnecessary to cite, are to like effect as the three mentioned. Their differences are not in substance, but only in phraseology that expresses the same conception of the requirements of the statute. They regard the latter as a rule of prudence for the safeguarding of the estates of deceased persons. It exacts of a claimant proof of the material features of her demand independent of her personal testimony. This non-personal proof need not be of such cogency that alone it can overcome any proof which the defendant might assemble but alone it must establish a *prima facie* case in behalf of the plaintiff. The plaintiff's personal testimony may reinforce and corroborate this independent testimony, but the latter must be so complete, as to the material items of the claim, that it does not need any piecing-out by the personal testimony of the claimant. This, we believe, is a fair statement of our previous holdings, and we are also satisfied that the instruction given was in harmony with the above conclusions.

The newly discovered evidence, mentioned in the motion for the new trial consisted of the certificates of capital stock of some oil companies of the par value of $4,137.50. These the plaintiff averred she found 10 days after the trial ''in going through and sorting out a box of old magazines, papers and letters'' and they ''had been discarded as worthless by the said Willard H. Seaton.'' The use to which she expected to put these documents upon another trial was to have them account for the disposition of the sums of money which Seaton had inherited in the 16 years of his association with her. It will be recalled that he had received about $54,000 from the estates of his relatives in the period of time ending with his death, and beginning shortly prior to the time he met the plaintiff.

■■ Subd. 4, § 174, O. L., authorizes a court to grant a new trial on account of ''newly discovered evidence, material for the party making the application, which he could not with reasonable diligence have discovered, and produced at the trial.'' In *State v. Hill,* 39 Or. 90 (65 P. 518), this court quoted from a text the following six features which must be possessed by newly discovered evidence before it can warrant a court in granting a new trial:

''* * * (1) It must be such as will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be merely cumulative to the former evidence; (6) it must not be merely impeaching or contradicting the former evidence.''

We are of the opinion that the new evidence, described in plaintiff's affidavit and which she desires to offer upon a new trial, does not possess all of the

above requirements. We can not understand how it "will probably change the result." Fifty-four thousand dollars was the amount of the inheritance received by the deceased; to account for this she desires to offer in evidence worthless oil stock of the par value of $4,137.50. The latter amount is $50,000 less than the inheritance. Next, the rule demands that the evidence suggested upon the motion must have been discovered since the trial; that is, it must possess the feature of newness and constitute a discovery as distinguished from a fact already known: *State v. Magers*, 36 Or. 38 (58 P. 892). The evidence now suggested does not possess this quality; she was apparently possessed of information concerning the oil stock when she testified at the present trial, because in one instance at least she mentioned "the interest from the oil stock and the interest from the bonds that he had." In one of her affidavits she recites "and on diverse times and occasions I have seen the said Willard H. Seaton tear up and destroy a number of shares of stock which he then declared to be worthless, and for which he had paid many thousands of dollars, the exact amount of which being unknown to affiant at this time." Thus it is apparent that the plaintiff was aware before the trial that the deceased had invested thousands of dollars in worthless stock and that during the course of the trial she mentioned his investments in oil stocks. Discovery then did not characterize the evidence which she proposed to offer, but related only to the physical documents themselves. But to warrant a new trial evidence, which is merely cumulative, generally, is not sufficient: 20 R. C. L., New Trial, § 77. In the present instance, we believe, it did not justify the order. Although the plaintiff was aware at the time of the trial of the

deceased's loss of thousands of dollars through the purchase of worthless oil stock she apparently deemed it of so little importance that she made practically no mention of it. Possibly, she didn't realize fully the use to which this item could be put, but to warrant a new trial it must appear that the evidence is in fact newly discovered, and not merely the importance of it: 46 C. J., New Trial, § 216, p. 243. A party can not withhold part of his evidence, experiment with the balance, and in the event the verdict goes to his opponent obtain a new trial so that he may venture forth with the weapon he neglected upon the first trial. "No man is entitled to more than one fair trial" Mr. Justice RAND reiterated in *Timmins v. Hale*, 122 Or. 24 (256 P. 770). These considerations demand that the previous result should stand and that the circuit court erred when it attached to the so-called newly discovered evidence the significance of ordering a new trial.

It follows that the circuit court erred when it set aside its previous judgment. The order should be set aside and the former judgment dismissing the plaintiff's complaint should be reentered.

REVERSED.

BROWN and BELT, JJ., absent.

RAND, J., concurs in result.